# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| **CLAYTON THOMAS, JR.** | * | **CIVIL ACTION NO. 04-1439** |
| **VERSUS** | * | **JUDGE MELANÇON** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Clayton Thomas, Jr., born March 20, 1968, filed an application for supplemental security income (SSI) on March 13, 1985, based on mental retardation. After that claim was denied initially and on redetermination, claimant filed a second application for benefits on April 25, 1988. In December, 1992, as part of *Zebley*[1] readjudication, claimant was found to have been disabled beginning March 1, 1985, based on mild mental retardation and a schizophreniform disorder.[2]

---

[1] *Sullivan v. Zebley*, 493 U.S. 521, 110 S.Ct. 885 (1990).

[2] The Wechsler Adult Intelligence Scale-Revised administered by Dr. Mark Daniel Fruge on April 10, 1985, revealed a verbal IQ score of 71, performance IQ of 71, and full scale IQ of 70, which was within the borderline range of intelligence. (Tr. 198-200). Another WAIS-R dated March 17, 1987, showed a verbal IQ of 65, performance IQ of 64, and full scale IQ of 64. (Tr. 84, 235, 267). Additionally, claimant was hospitalized from December 11-16, 1992, due to a schizophreniform disorder. (Tr. 243-47).

As part of continuing disability review, claimant was found to have attained medical improvement as of December 1, 2001. His eligibility for benefits ceased on February 28, 2002. Claimant appealed the cessation of benefits, which was affirmed on March 13, 2003.

Thereafter, claimant requested a hearing before an Administrative Law Judge ("ALJ"), which was held on September 11, 2003. After an unfavorable decision by the ALJ, claimant filed a request for review by the Appeals Council. The Appeals Council denied review on April 30, 2004. On July 12, 2004, claimant filed a Complaint for judicial review with this Court.

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is not substantial evidence in the record to support the Commissioner's finding that the claimant was not disabled and that this case should be remanded for further proceedings.

In fulfillment of F.R.Civ.P. 52, I find that this case should be remanded for further proceedings, based on the following:[3]

---

[3]Although all of the records were reviewed by the undersigned, only those relating to the cessation of benefits are summarized herein.

**(1) Psychological Examination by Dr. Alfred Buxton dated May 21, 2002**.

Claimant stated that he had been in special education until he quit school at the age of 20. (Tr. 248). He had worked at a hotel laundry for three weeks about three years prior, but quit because he did not enjoy it. His first marriage lasted one month, and he had been separated for four months from his second wife of four years. He had 10 children ranging in age from 3 to 14 years. He did not have a driver's license after losing his wallet, but admitted to driving without a license. (Tr. 249).

Claimant smoked about a half-pack of cigarettes per day, and had last used marijuana two years prior. He noted that he had been arrested three or four times, the last being about two years prior for carnal knowledge of a juvenile, changing a license plate, and fleeing from the police. As to general health, he complained of intermittent pain after being hit by a car at age 12. He reported that he had been at New Horizons about two years prior for one week after slapping his wife. He also stated that he had been an inpatient 12 years prior for the same thing. He was receiving no outpatient mental health intervention at that time. His medications included Chlorzoxazone,[4] Hydroxyzine Pamoate,[5] Bextra, and Paxil.

---

[4]Used as a muscle relaxant. http://health.yahoo.com/drug

[5]Used for anxiety relief. *Id.*

Claimant's sleep, appetite, and energy were fair. Socially, he had adequate contact. His primary hobby or pleasure was to listen to music. He was able to cook, clean, shop, manage money, travel, communicate, and manage time independently.

On examination, claimant had no indication of any sensory or motor handicap. His verbal receptive and expressive language skills were good, as was dress and groom. His social skill was fair. Recent and remote memories were intact. Ability to attend and concentrate was good. Pace was even.

Intellect appeared to be a bit sub-average. Judgment, reasoning, and reflective cognition were fair. Insight was poor. Cognitions were simple and concrete, but logical. Mood was even, but claimant tended to be a bit immature and at times inappropriate. He had no evidence of any hallucinatory or delusional phenomena, but occasionally might have some hypervigilance. He reported occasional passive suicidal ideation.

Self-image and goal orientation were fair. (Tr. 250). Claimant was alert, responsive, and oriented in all four spheres.

Dr. Buxton determined that claimant was of sub-average general intellect with commensurate adaptive daily living skill development. He was regarded as being at least marginally competent as a manager of his own personal affairs. Clinically, he presented with a depressive disorder, not otherwise specified, with degree of

impairment mild to moderate and prognosis fair; partner relational problem, with degree of impairment moderately severe and prognosis guarded, and chronic pain, with degree of impairment mild and prognosis fair. His Global Assessment of Functioning score was 65 over the previous 12 months.

Dr. Buxton recommended outpatient mental health intervention to deal with the depression, chronic pain, and marital difficulties. However, he opined that "[t]he presence of the aforementioned would not preclude this individual from securing and maintaining gainful competitive employment within the general community at large commensurate with his functional capabilities."

**(2) Consultative Examination by Dr. R. F. Taylor dated June 25, 2002**.

Claimant complained of intermittent low back pain for the past several years, for which he was taking Bextra. (Tr. 252). He also reported a history of mental problems, for which he was not receiving treatment at that time. He had planned to go to school to learn how to drive an 18-wheeler.

On examination, claimant was 70 inches tall and weighed 241 pounds. His blood pressure was 129/78. His pulse was 67 and regular. His vision in both eyes was 20/20 without correction. Peripheral vision was 85 degrees bilaterally.

On musculoskeletal examination, claimant's range of motion of the back and neck were normal. (Tr. 253). Straight leg raising was negative. Claimant had no

paracervical or paravertebral muscle spasm or tenderness.

Range of motion of the extremities was normal. Claimant had no loss of muscle strength or atrophy. Grip strength was excellent. Manual dexterity and grasping ability was normal.

Claimant had no swelling, instability, or deformities of the joints. Gait and station was normal. He could walk on his heels and toes without difficulty.

Neurologically, claimant was oriented to time, place, and person. His cranial nerves, motor nerve and sensory nerve function were normal. Deep tendon reflexes were normal.

Psychologically, claimant was neatly dressed and well-groomed. His behavior was appropriate. Thought content, affect, and mood were normal. Concentrating ability and memory was normal.

Lumbosacral spine x-rays showed posterior spurring at the L5-S1 level, and to a lesser extent at the L4-5 level.

Dr. Taylor's impression was intermittent mechanical low back pain, probably secondary to spondylosis of the lumbar spine. (Tr. 254). He noted that claimant's examination was completely normal. He opined that claimant's work-related activities needed to be limited to no lifting over 50 pounds, and no frequent lifting or carrying over 35 pounds.

**(3) Psychiatric Review Technique ("PRT") Form dated August 7, 2002**.
Dr. R. H. Rolston assessed claimant for depressive disorder not otherwise specified. (Tr. 255). He determined that claimant had a mild degree of limitation as to restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. (Tr. 265). There was insufficient evidence of episodes of decompensation, each of extended duration.

**(4) Residual Functional Capacity ("RFC") Assessment – Mental dated August 7, 2002**. Dr. R. H. Rolston determined that claimant was moderately limited as to his ability to understand, remember, and carry out detailed instructions, and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace. (Tr. 269-70). He was not significantly limited in any other area.

**(5) Records from Metoyer Family Medical Center dated October 26, 2001 to February 4, 2003**. During this period, claimant was treated for a sore throat, back pain, headaches, right shoulder pain, knee pain, depression, and anxiety. (Tr. 273-81). On May 15, 2002, claimant complained of depression after a friend's suicide, for which he was prescribed Paxil. (Tr. 278).

Claimant reported low back pain on an intermittent basis on June 14, 2002. (Tr. 277). The assessment was musculoligamentous lumbar strain, for which he was

prescribed Darvocet.

On December 3, 2002, claimant complained that Paxil was causing him to stay up, so he stopped taking it. (Tr. 275). However, when he returned on January 3, 2003, with knee pain, he wanted to resume Paxil. (Tr. 274). On February 4, 2003, he reported that Paxil helped. (Tr. 273).

### (6) Consultative Evaluation by Dr. Sandra Durdin dated November 12, 2003.[6] Dr. Durdin found that claimant's speech, vision, and hearing seemed normal. (Tr. 312). He was passive and barely responsive. He had a passive aggressive tone and manner of relating. Dr. Durdin found evidence that he malingered on evaluation; therefore, the information he presented could not be viewed as reliable. She noted that he seemed to try to intimidate her in a very subtle manner.

Claimant's medications included Alprazolam for sleep and Zyprexa.[7] He had quit alcohol and cannabis six months prior. He reported that voices talked to him and told him to hurt himself. He had a driver's license and shopped for himself. He denied dating and said that he attended church.

---

[6]Claimant argues that this post-hearing report was not submitted to him prior to the ALJ's decision denying benefits. (rec. doc. 15, p. 9).

[7]An antipsychotic medication used for treating the symptoms of conditions such as schizophrenia and bipolar disorder. http://health.yahoo.com/drug

On examination, claimant was oriented in all spheres. He claimed not to know the day of the week, the correct season, or the year. Attention and concentration were good. Speech, language, articulation, and expressive vocabulary were good. His affect was normal. His mood was of subtle hostility and passive aggressiveness. His fund of knowledge and abstract reasoning were good. Calculation was adequate in addition, subtraction, and simple money problems.

Claimant's estimated level of intellectual functioning was borderline at minimum. His thought content and organization were good. His alleged perceptual distortions did not appear credible, as he did not present with any evidence of psychosis other than sporadic verbalizations or vague voices. (Tr. 313).

Dr. Durdin noted that claimant was completely uncooperative on the WAIS III, and embellished his answers with dramatic verbalizations and loss of time. The result of this performance was that he scored zeros on almost every subtest with subtest scores of one and IQs in the moderate mentally deficient range. This ;endered the scores completely invalid. Dr. Durdin observed that there was no diagnosis from any other professional to suggest mental deficiency. She would not rate his intelligence below borderline.

Dr. Durdin stated that claimant appeared to have substance dependence problems and personality disorder problems. She did not see evidence to substantiate

a psychotic disorder or any acute depression or anxiety. Self-care skills were adequate.

Dr. Durdin's impression was polysubstance dependence, by history, allegedly in recent remission; estimated borderline intelligence; personality disorder, NOS, Cluster B, back pain by report, and a history of incarceration. She determined that claimant's ability to understand, remember and carry out simple instructions was good, but his ability to manage detailed instructions was moderately to markedly impaired depending on complexity. His ability to maintain attention to perform simple repetitive tasks for two-hour blocks of time was good. His ability to sustain effort and persist at a normal pace over a 40-hour workweek was good if motivated. His ability to relate to others, including supervisors and coworkers, was adequate.

Dr. Durdin noted that claimant could be uncooperative if he chose not to be in a particular setting. His ability to tolerate the stress and pressure associated with day-to-day work activity and demands was adequate if motivated. His capability to manage personal financial affairs, including benefits, was good if there was proof of sobriety.

In the Medical Source Statement of Ability to do Work-Related Activities (Mental), Dr. Durdin determined that claimant was moderately to markedly limited as to his ability to understand, remember, and carry out detailed instructions. (Tr.

314). She found that claimant was moderately limited as to his ability to interact appropriately with the public, supervisors, and coworkers; respond appropriately to work pressures in a usual work setting, and respond appropriately to changes in a routine work setting. (Tr. 315). She noted that he had features of personal disorder, which meant that he might cooperate but might be manipulative and passive aggressive. She noted that his response varied according to motivation.

(7) **Claimant's Administrative Hearing Testimony**. At the hearing on September 11, 2003, claimant was unrepresented. (Tr. 318). The following colloquy transpired between the ALJ and claimant regarding claimant's right to counsel:

> ALJ: Mr. Thomas, before I do go further with the opening statement, I'd like to cover one matter with you, and that is the fact that you do have the right to have an attorney or a non attorney, such as possibly a paralegal from the Legal Services Corporation appear with you and represent you in the hearing, although you aren't actually required to have an attorney or representative. Are you aware that you have that right?
>
> CLMT: I am represented. My attorney is with me at all times and I'm blessed.
>
> ALJ: Yes, sir. And who is your attorney then?
>
> CLMT: Jesus.
>
> ALJ: All right. Well, I appreciate that fact, but you also have the right to have say a human attorney at law represent you in the hearing or possibly somebody from Legal Services

Corporation. And the reason I am bringing that up at this time is because even though the time has come for a hearing in your case, if you would feel that you would like to have some additional time to try to discuss the case with an attorney or possibly with somebody from Legal Services Corporation which sometimes handles cases like this free of charge, I would be willing to postpone the hearing in order to give you a chance to do that. On the other hand though, you don't actually have to have an attorney or representative so if you do want to go ahead with the hearing today as scheduled without anyone representing you, we can also do that. It's entirely up to you. It makes no difference to me either way.

CLMT: I'll go ahead with it.

ALJ: You want me to go ahead with the hearing today then without an attorney or representative?

CLMT: I'm already represented.

ALJ: All right. Without an attorney or representative other than Jesus?

CLMT: Yes, Sir.

ALJ: All right. I will proceed with the opening statement then.

(Tr. 318-19).

Claimant testified that he was 35 years old. (Tr. 323). He stated that he was 5 feet 11 inches tall and weighed 233 pounds, which was below his normal weight of 255. He reported that he had completed the third grade in special education classes. (Tr. 324).

Claimant stated that he had attended school until he was 20 years old. He reported that he could write a little bit, but could not read. He said that he could do basic arithmetic. (Tr. 325).

Regarding work, claimant testified that he had attended trade school for three months to become an auto technician. (Tr. 325). He stated that he had worked in housekeeping about two months prior to the hearing. (Tr. 326). He reported that he had quit because he had some problems with some of the coworkers.

Additionally, claimant stated that he had washed cars at a dealership for two days. He testified that he had quit after a spider bit him. He reported that he had to have surgery on his stomach in July after a spider bite. (Tr. 332).

As to activities, claimant testified that he drove once or twice a week. (Tr. 327). He stated that he groomed himself, did laundry, picked up papers in the yard, made breakfast, watched television, and rode his bicycle. (Tr. 328). He reported that he did not visit with friends or relatives. He also stated that he attended church and shopped with his wife. (Tr. 329).

Regarding complaints, claimant testified that he had trouble sleeping. He said that his appetite was "so-so." He stated that he had nausea and vomiting because of acid reflux. (Tr. 329-30).

Additionally, claimant stated that he had been diagnosed with schizophrenia. (Tr. 330). He reported that he still heard voices, but did not like to talk about it because "they put my mama away for that." He testified that he did not go out around a lot of people, and that being around his children aggravated him a lot. (Tr. 331).

Claimant said that he was still being treated once or twice a month for back pain and hearing voices. (Tr. 331, 334). He stated that he was taking Paxil and Zyprexa for his nerves. (Tr. 334). He stated that the Zyprexa helped him better because the Paxil kept him awake. (Tr. 335).

As to restrictions, claimant testified that he had trouble in the morning because of back pain. (Tr. 335). He reported no problems with using his hands. He stated that he could lift about 40 pounds. (Tr. 336).

Claimant said that he did not have any problems with his memory or concentration. He stated that it bothered him to be around crowds. He also had difficulty dealing with stress or pressure. He reported that he could not work because his nerves sometimes became "raggedy."

**(8) Claimant's Wife's Administrative Hearing Testimony**. Claimant's wife, Roxanne Thomas, testified that she had been married to claimant for almost six years, but they had been separated for close to three years. (Tr. 337). She stated that he did not sleep, and saw and heard things. (Tr. 338). She reported that he could not stand

the kids and the noise. She said that he could not get along with too many people and kept to himself.

Additionally, Ms. Thomas reported that claimant complained of low back pain. (Tr. 339). She stated that his back had snapped on him that year when he was doing yard work. She said that he was taken away in an ambulance and given a steroid shot for pain. She testified that his condition had become worse. (Tr. 340).

**(9) Administrative Hearing Testimony of Beverly Prestonback, Vocational Expert ("VE")**. Ms. Prestonback described claimant as basically illiterate. (Tr. 343). She stated that this only job was as a motel housekeeper, which was classified as medium with an SVP of three.

The ALJ posed a hypothetical in which he asked the VE to assume a claimant of the same age, education, and vocational background; who had no exertional limitations; who would be precluded from performing detailed or complex work, but cognitively capable of one- to two-step operations under general supervision, and who was limited to no more than occasional interaction with the general public. (Tr. 343-44). In response, Ms. Prestonback testified that he could perform work as a janitor, of which there were 29,000 jobs statewide and 2,037,000 nationally; maid and houseman, of which there were 11,000 jobs statewide and 665,000 nationally, and groundskeeper, of which there were 3,800 jobs statewide and 373,000 nationally. (Tr.

344-345).

In the next hypothetical, the ALJ asked the VE to assume a claimant who could perform no more than medium work; who would be precluded from performing detailed or complex work, but was cognitively capable of one- to two-step operations under general supervision, and who would be restricted to no more than occasional interactions with the general public. (Tr. 345). In response, the VE testified that the same jobs would be acceptable if the heavy jobs were eliminated. For janitors and cleaners, the number would drop to 1,700,000 nationally and 26,700 statewide; for maids and houseman, the number would be reduced to 500,000 nationally and 9,000 statewide, and for groundskeepers, the number would drop to 92,800 nationally and 1,300 statewide.

Finally, when the ALJ asked whether any jobs would be available to a claimant who had all of the problems as testified to by claimant and his wife, Ms. Prestonback stated that there would not. (Tr. 345-46).

At the end of the hearing, the ALJ indicated that he was going to leave the record open and refer claimant for a psychological consultative examination for a mental status evaluation, WAIS-R testing, and completion of the medical assessment form. (Tr. 348-49).

(**10) The ALJ's Findings**.  Claimant argues that: (1) the ALJ denied him due process of law by failing to obtain a valid waiver as to his right to representation; (2) the ALJ failed to submit post-hearing evidence to claimant for review, comment, or objection prior to the decision; (3) substantial evidence fails to support the presence of medical improvement, and (4) this matter should be reversed, remanded and interim benefits awarded, pending the completion of remand proceedings.  Because I find that the ALJ denied claimant his right to cross-examine the physician who prepared the post-hearing report and to present rebuttal evidence, I recommend that this case be **REMANDED** for further proceedings.

Claimant first asserts that the ALJ denied him due process of law by failing to secure a valid waiver of his right to representation.  (rec. doc. 15, p. 5).  It is well established that the ALJ owes a duty to a claimant to develop the record fully and fairly to ensure that his decision is an informed decision based on sufficient facts. *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996).  When a claimant is not represented by counsel, the ALJ owes a heightened duty to "scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts." *Id*., citing *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984).  However, to merit reversal of the ALJ's decision, a claimant who does not validly waive his right to counsel must prove that he was thereby prejudiced. *Id*.; *Gullett v. Chater*, 973 F.Supp. 614, 621 (E.D. Texas

1997).

The record reflects that the ALJ informed claimant of his right to counsel at the hearing. (Tr. 318-19). After being so advised, claimant agreed to proceed without a representative. However, claimant contends that this waiver was neither intelligent nor informed due to his intellectual and psychological impairments. (rec. doc. 15, p. 5). He further asserts that the ALJ failed to comply with the requirements of HALLEX I-2-65-2 (A) (rec. doc. 15, p. 7), which provides as follows:

> The ALJ will open the hearing with a brief statement explaining how the hearing will be conducted, the procedural history of the case, and the issues involved. In supplemental hearings, the ALJ need only identify the case, state the purpose of the supplemental hearing, and describe the issue(s) to be decided.
> Generally, the content and format of the opening statement are within the discretion of the ALJ. However, if the claimant is unrepresented, the ALJ must ensure that the claimant is capable of making an informed choice about representation. For example, the ALJ should ask an unrepresented claimant the following questions on the record:
> 1. Did you receive the hearing acknowledgment letter and its enclosure(s)? (If not, the ALJ will provide the claimant with a copy and the opportunity to read the letter.)
> 2. Do you understand the information contained in that letter concerning representation? (If not, the ALJ will explain the claimant's options regarding representation, as outlined in the acknowledgment letter. Specifically, the ALJ will explain the availability of both free legal services and contingency representation as well as access to organizations that assist individuals in obtaining representation.

***

Once the ALJ has determined that the claimant is capable of making an informed choice, he or she will secure, on the record, the claimant's decision concerning representation. The ALJ will also enter into the record the acknowledgment letter and enclosure(s) sent to an unrepresented claimant only if the claimant elects to proceed pro se at the time of the hearing.

While HALLEX does not carry the authority of law, the Fifth Circuit has held that "where the rights of individuals are affected, an agency must follow its own procedures, even where the internal procedures are more rigorous than otherwise would be required." *Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000) (quoting *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. 1981)). The record reflects that the ALJ did not comply with HALLEX since he failed to ask claimant if he had received a copy of the hearing acknowledgment letter. However, the Fifth Circuit requires a showing that the claimant was prejudiced by the agency's failure to follow a particular rule before such failure will be permitted to serve as the basis for relief from an ALJ's decision. *Shave v. Apfel*, 238 F.3d 592, 597 (5th Cir. 2001). Prejudice can be established by showing that additional evidence would have been produced if the ALJ had fully developed the record, and that the additional evidence might have led to a different decision. *Newton,* 209 F.3d at 458.

In support of his argument that he was prejudiced, claimant asserts that the ALJ introduced Dr. Durdin's report without advising him that the evidence had been

placed into the record. (rec. doc. 15, p. 9). He contends that this deprived him of the opportunity to review the post-hearing evidence, to file objections or to request cross-examination of the report examiner. (rec. doc. 15, p. 10). He states that the ALJ's failure to advise him of such evidence violated HALLEX I-2-730 B, which specifically requires an ALJ who proffers evidence to inform a claimant of the right to cross-examine the author of the evidence by referring in the ALJ's proffer letter to the claimant's right "to request[ ] a supplemental hearing and the opportunity to cross-examine the author(s) of any posthearing report(s)."[8] (rec. doc. 15, p. 9).

Claimant also cites *Tanner v. Secretary of Health and Human Services*, 932 F.2d 1110 (5th Cir. 1991), in support of his argument that the ALJ's reliance on Dr. Durdin's posthearing report was erroneous.[9] (rec. doc. 10, p. 6). In *Tanner*, the ALJ sent post-hearing written interrogatories to a vocational expert without notifying claimant's attorney. After the vocational expert issued a report, the ALJ sent a copy

----

[8]The most current version of HALLEX I-2-730 B states that the proffer letter must:
• Give the claimant a time limit to object to, comment on or refute the evidence, submit a written statement as to the facts and law that the claimant believes apply to the case in light of the evidence submitted, submit written questions to be sent to the author(s) of the proferred evidence or exercise his or her rights with respect to requesting a supplemental hearing and the opportunity to cross-examine the author(s) of any posthearing report(s) if it is determined by the ALJ that such questioning is needed to inquire fully into the issues.
• Advise the claimant that he/she may request a subpoena to require the attendance of witnesses or the submission of records and the procedures for the requesting and issuance of a subpoena.

[9]Claimant also relies on *Briscoe v. Secretary of Health and Human Services*, No. 85-0028 (W. D. La. December 7, 1987), an unpublished decision by the late Judge Edwin Hunter which is attached to claimant's brief. (rec. doc. 15-2, Appendix).

to claimant's counsel. In response, claimant's counsel sent a letter to the ALJ stating his objections to the interrogatories.  Without addressing counsel's objections, the ALJ incorporated the expert's report into the record and issued a ruling rejecting claimant's benefits claim based on the expert's vocational conclusions.  The Fifth Circuit held that the ALJ committed reversible error by relying on the post-hearing report to deny claimant's request for benefits without giving counsel an opportunity to cross-examine the vocational expert.

While the Commissioner acknowledges that claimant cited the relevant HALLEX provision, she argues that claimant failed to cite the Fifth Circuit's holding in *Lidy v. Sullivan*, 911 F.2d 1075, 1077 (5th Cir. 1990), which held that *by requesting a subpoena*, a claimant has the right to cross-examine an examining physician. (emphasis added) (rec. doc. 16, p. 9).  The Commissioner argues that because claimant did not request a subpoena, he waived the right to cross-examine Dr. Durdin. Thus, she asserts, claimant cannot show that he was prejudiced by not being allowed to cross-examine Dr. Durdin or comment on her examination results.

However, a critical factor in this case is that claimant was never given the *opportunity* to waive his right to cross-examine and subpoena Dr. Durdin.  (emphasis added).  After *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842

(1971),[10] all of the circuit courts of appeal to consider the issue have ruled that due process requires that a claimant be given the opportunity to cross examine and subpoena individuals who submit reports. *Lidy*, 911 F.2d at 1077; *Kelly v. Chater*, 952 F.Supp. 419, 424 (W.D. Tex. 1996). Further, in *Tanner*, the Fifth Circuit held that a wavier of the right to cross-examination cannot be inferred from the failure to make an express demand for cross-examination. Specifically, in the case of reports received after the close of the administrative hearing, a waiver of the right to cross-examine must be "clearly expressed or strongly implied" from the circumstances. (internal citation omitted). *Id*. at 1113. Clearly, that did not happen here.

In this case, there is no indication that claimant was provided notice of Dr. Durdin's report or was given an opportunity to cross-examine her or provide evidence to rebut her findings prior to the ALJ's decision. Without that opportunity, claimant was not provided due process. Thus, I find that claimant has shown prejudice due to the ALJ's placing of this post-hearing report into the record without giving claimant an opportunity to cross-examine the issuer of the report.

---

[10]*Richardson* held in part that when a claimant has not exercised his right to subpoena the reporting physician and provide him with the opportunity for cross-examination, the report can be received into evidence despite its hearsay character and absence of cross-examination.

Accordingly, the undersigned recommends that this case be **REMANDED** to the Commissioner for further administrative action pursuant to the fourth sentence of 42 U.S.C. § 405(g). This includes, but does not limit, sending the case to the hearing level with instructions to the Administrative Law Judge to give claimant an opportunity to confront and cross-examine Dr. Sandra Durdin, or to enable him to obtain a medical opinion from another expert of his choice. Claimant shall be afforded the opportunity to submit additional evidence and to testify at a supplemental hearing.

Inasmuch as the remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA). See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992) and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN TEN (10) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.** *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, **79 F.3D 1415 (5TH CIR. 1996).**

Signed this 21st day of December, 2005 at Lafayette, Louisiana.

_____
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE